The next case today is 23-1291 A. Richard Schuster v. Wynn Resorts Holdings, LLC, et al. Attorney Garrett, please introduce yourself for the record. Good morning, Your Honor. Joshua Garrett on behalf of A. Richard Schuster and a few of your class. May I reserve three minutes for rebuttal, please? You may. Thank you. The Encore Casino has the privilege of being only one of three licensed casinos in the Commonwealth of Massachusetts. Encore has been given basically a license to print money. And they can provide a service that is otherwise illegal in this Commonwealth. And with that privilege comes great responsibility. Among these responsibilities, they've got to be fair and they cannot be deceptive. Yet on the fifth day of operations, Encore made the intentional decision to convert its ticket redemption units to machines that dispense coins to a coinless policy that instead of returning coins to customers that would leave the casino with them, converted these into essentially IOUs. IOUs that were illiquid and couldn't be redeemed anywhere but at Encore. IOUs that were only valid for a year. And IOUs that, unlike the coins that would have remained in someone's pocket, could actually be wagered. We have unrefuted expert witness testimony in this case that says not only were these coins wagered, and that was both the intent and the result of this policy, but they were also wagered with additional funds because that would be less than the minimum wager at these slot machines. Counsel, can you please tell me as clearly as you can what you think is the operative legal standard to show an unfair business practice under 93A? Just, you know, very clearly because the briefs provide lots of different standards and it would be really helpful if you could say what you think is the operative one and what case or cases you think most clearly lay it out. So the unfairness standard, just limited to unfairness, not getting into sections. Correct. I just want to look at unfairness, please. Yeah. Conduct is unfair within Section 2 of Chapter 93A if it falls within at least the penumbra of some common law, statutory, or established concept of unfairness, or it is immoral, unethical, oppressive, unscrupulous, and causes substantial injury to consumers. But how are we supposed to determine those things? That's more what I'm looking for. Not what the statute says, but what case law says, how do you actually operationalize those provisions? So this Court doesn't need to do that because Judge Burroughs already did that below when she decided the motion to dismiss. And in fact, so the legal standard, so there's essentially two parts to the standard. First, you have this, what I call the concept of unfairness, which is, is there some sort of regulatory statutory authority? So is there some sort of law, statute, common law, policy, something that the conduct offends notions contained within those statutes? And the second type of unfairness is, is something inherently unfair? And the inherently unfair concept comes by way of these other, you know, it doesn't have to be a statute, but it could be something that's immoral, it could be unethical, oppressive, and the like. I can think of no better example than a casino. We're not talking about a shopping mall or a store, a gas station. A casino whose job is to encourage wagering has come up with a policy that they know is designed to take something that would have left that casino and not been wagered and converted. But this Court, the answer, Judge Rickleman, to your question is, juries can understand what that standard is. The judge can read the jury instructions to the jury and say, you know, it has to fall within the penumbra, blah, blah, blah, blah, blah, blah, and then hear the facts. And we trust juries in every type of case in this circuit. Counsel, instead of making a jury argument to us, we'd appreciate it if you were more analytical. So let's go to your two notions, that it offends or is within the penumbra of something that is regulated, okay? And as I understand it, what you're referring to is the general policy of not encouraging unreasonable or excessive gambling. Is that correct? That's one of the, we have about five reasons. That's probably number five on the list, to be frank. Gosh, I would have thought it was number one. Well, it's important. Let me go back. Suppose the District Court is correct that there is no real violation of the internal control standard. Suppose the District Court is also correct that there's been no formal approval by the state regulatory agency, only staffers. And suppose the District Court is correct that there's not a direct violation of regulations, okay? Bear with me. Suppose all of that is correct. Then I think what you're left with is this excessive gambling. Is that, am I correct about that? So we have irresponsible gaming laws and undesired wagering. We also have violations of refund and return policies, which is, I hate to use the term per se, unfair and deceptive under the Attorney General's regulations. But also, as can be seen in the Norwegian Cruise Lines case, that's a 93A violation if someone doesn't return money to someone when it's requested. And we also say it violates Chapter 23K, Section 2, which defines slot machines as All right. I understand. Those arguments were presented to the District Court, those two additional arguments which rejected it. So let me switch over to inherently unfair. Sure. So as I understand your theory, it is basically they made a choice here. They started out with machines that dispensed coins. They then switched to machines that dispense only dollar bills and otherwise give you a ticket. With that ticket you have, as a gambler, there are three choices. You can either go cash it out, although it may only be for ten cents, or you can continue to gamble it by putting it in a slot machine, which presumably is right next to or the same slot machine that has just given you the ticket. But you may also have to put in a dollar bill to meet the minimum. Or you can decide it's not worth the hassle and you can throw away the ticket because it's only ten cents or a quarter or something. And that in two of those three scenarios, the casino makes money essentially skimming money from the gamblers that it would not otherwise have had it provided coins as it initially did. Is that basically the theory? Yes, Your Honor. The theory is that it is immoral, unethical, unscrupulous to take your customer's money that doesn't belong to you. I think that should apply to every business in the Commonwealth. If a client calls me... Boy, that's awfully broad. I'm not sure people would think it was immoral or unethical. They would just consider it to be a business practice. So why is it unscrupulous or isn't there one other word that is used? Immoral, unethical, oppressive, and unscrupulous. Okay, oppressive or unscrupulous. Yes, Your Honor. And the reason why we get to that standard is because we are dealing with casinos. And when we deposed Robert DeSalvio, the former president, and we asked him the purpose of this, he starts touting his experience and why they implemented certain policies. They knew exactly what they were doing. And our expert laid out exactly why they were doing it. Okay, so you're accusing, excuse me, casinos are unlike other businesses. Why? Well, because you're dealing with cash. The commodity that you're selling is cash and the... I thought you were going in the direction that gambling can be an addiction. And so one needs to be careful in that area. Well, I would agree with that, Your Honor. And I think that that's one of the responsibilities that the casino has. But here where I think the difference between the casino and the corner store, yes, all these businesses deal in cash. But what you're buying at the casino is the chance that you could win more cash versus a store you're buying a product, a commodity. Here it's all about cash. And if they've come up with a policy... Counsel, can I just try and focus you on a specific question that I'm wondering about? I understand you think this policy is unfair for the reasons you've specified in your brief. But your opposing counsel has argued that it's actually permitted by GLI-20, or the version of it that was in effect at the time, that the plain language of it permits casinos to use trues to give you bills and then this ticket or voucher for the change. That's perfectly fine. And that that should defeat any unfairness claim here. Can you respond to that? First, do you agree that the plain language of GLI-20 permits this? I don't. Okay, can you tell me why? Yes, and I have a copy of GLI-20 version 1.5, which was the old version. And this is in the record appendix at page 1479 about this standard. It talks about this is the scope and the applicability of the standard. It says, The standard has been produced by Gaming Laboratories International for the purpose of providing independent certifications... Where are you reading? On 1479. Okay. And it says, The standard has been produced by Gaming Laboratories International for the purpose of providing independent certifications to suppliers, not to casinos. This is what the GLI is providing, guidance and standards for the manufacturers of the kiosk. In this case, that's EVERI, E-V-E-R-I. That's the manufacturer of the machine. So they're saying if you produce those machines, they have to have these capabilities. With respect to what the casinos can do, that's not subsumed in here. And I'm going to have some rebuttal time. During that time, I'm going to explain to you additional reasons why the GLI standards don't apply. So you're saying that that doesn't apply, the GLI doesn't apply to the casinos. Correct. It only applies to suppliers. And GLI, as we know, GLI-20 was amended. And obviously, that's irrelevant to the issues. But when it was amended, they amended the scope and the applicability. And GLI version 2.0 says it applies, this documents tend to be used by regulatory bodies, operators, casinos, and industry suppliers, again, like the initial version. But in the new version, it scrubbed all the language that they now seem to rely on, even though they never really asserted it below. But it does apply to casinos. I know you're over your time. I just have a quick kind of clean-up question. You say in your brief that you don't concede subject matter jurisdiction or consent to it. I can't remember exactly. Is there subject matter jurisdiction here? So I think the answer to that is that there shouldn't have been when the case was remanded. Under the home exception and the local controversy exemptions, when we finally got the data from the defendants, we saw that there was more than two-thirds members of a putative class that were residents of the Commonwealth of Massachusetts. You didn't make that argument in your brief. We didn't, and I think the reason why we didn't raise it in the brief is I think that this circuit's precedent is that ship has sailed, that the argument would have been too late. And we've come across these issues in all of these class actions. We don't have the data. We don't know what the numbers look like. And unfortunately, by the time we do, and it looks like there's more than two-thirds, there probably shouldn't have been subject matter jurisdiction. Okay. Thank you. May I ask one more thing just to clarify? Does the record show anything about whether other casinos in the country continue to dispense coins as well as bills from the TRUs? So the only evidence in the – well, sorry, there's two bits of evidence in the record. One of them is the transcript of the Gaming Commission hearing that took place three days after we filed the lawsuit. At that hearing, the Gaming Commission and Encore both agreed that they were the only casino in the Commonwealth that failed to dispense coins. Plainridge and MGM did dispense coins. With respect to other casinos throughout the country, there was testimony by Robert DeSalvio, the former president, that it was his experience that other casinos did engage in that practice, but when we asked him to name any, he couldn't. Okay. Thank you. Thank you. Will Attorney Dennison for the appellate please step up to the podium and introduce yourself for the record? Good morning, Your Honor. Wayne Dennison on behalf of the Wayne Enfield. We're going to ask that this court affirm the thoughtful, well-reasoned judgment of Judge Burroughs, largely because the practice at issue is expressly permitted. Encore Boston Harbor Resort and Casino is one of the most heavily regulated businesses in the Commonwealth of Massachusetts. In fact, they cannot operate the casino unless the Massachusetts Gaming Commission has staff for on-site operation, and the Massachusetts Gaming Commission is charged with a strict oversight of all gaming establishments. Could you get to the point, please, of precisely what you think constitutes approval of this practice? The mere approval of the casino doesn't do it. Perhaps the approval of the GIC does it, but your opponent has just said they don't even really apply. Okay. So with respect to GLI 20 version 1.5, which my opponent just suggested, did not in fact apply, Massachusetts law actually takes care of that. 205 CMR 143.07, and that's in our addendum 12. It says, a gaming licensee and a gaming device vendor shall comply with, and the commission shall adopt and incorporate by reference, Gaming Laboratory International Standards GLI 20. So the licensee, in addition to the supplier, has to comply. And that's directly mandated by Massachusetts law. Doesn't the GLI give discretion so that you could have either or both types of TRUs here? You certainly can operate TRUs that dispense coins or some that dispense vouchers. In fact, there are still two TRUs at Boston Encore Casino that do dispense coins. Okay. So your argument has to be that because the GLI provides for both parts, a choice to use only non-coin dispensing parts must be deemed to be approved. Is that it? Well, it's beyond deemed to be approved. This very practice was brought before the Massachusetts Gaming Commission by this plaintiff within days after it was initiated. And the Massachusetts Gaming Commission has not issued any cease and desist or has done nothing to prevent this practice. What they did was they – So is that part of your argument that it's explicitly approved because they haven't said it's not approved? It's explicitly approved under GLI 20 and Massachusetts law. But the Gaming Commission has an independent obligation to issue an order to cease and desist any activity that violates Massachusetts law. And my argument is given the fact that the Gaming Commission is very directly involved in the operations of these casinos, they are onsite of these casinos, the Massachusetts Gaming Commission well knows that this is the practice. In fact, they gave us some suggestions as to how to make it better by putting signage on the sheets, which – Counsel, isn't it true that the precise question of whether a choice not to have coin dispensing TRUs has never been put to the Gaming Commission? In any formal manner, Your Honor, I don't believe it has. Okay, now let's work backwards. It surely cannot be the case that the failure of a regulatory agency to take action amounts to approval. Do you agree? Yes, Your Honor, I agree with that. Okay, so are we now back to your GLI 20 version 1.5 argument? We are largely back to that. But this is not simply a situation in which the regulator chose not to take action. This particular issue was raised with the regulator by this plaintiff. So this was not mere inaction. Has there been a formal ruling by the MTC? No. Nonetheless, our principal regulator knows full well of this policy. And quite frankly, with respect to at least 11 of the 12 visits, the plaintiff knew of the policy because by then he had already sued about it. So in at least 11 of the 12 instances that he claims unfair and deceptive activity, he already knew that the coins would not be dispensed from the TRUs. Counsel, can I move you to sort of the next part of this analysis, which is let's just assume for a moment that GLI 20, that was in effect at the time, expressly approved what your client was doing. Let's just assume that. Isn't it correct that Massachusetts state law still would permit an unfair practice claim in any event? Or what is your position on that? Are you saying that if something is expressly permitted, there can never be an unfair practice under Massachusetts law? And if so, what's your precedent that supports that argument? I think if it's a permitted practice, then it comes under 93A Section 3 and therefore is not addressable through the 93A statute. So you think the statute itself resolves that? Yes, it does. Is there any case, Bob, that has looked at a similar situation that you're aware of? There's a body of cases from this court that talked about the protected practice defense and in each of those cases, that's what's being examined. Whether Section 3, under Section 3, this is simply a permitted activity. And did you clearly raise the protected practice defense before the district court? We certainly raised the issue that we had, that it was unlawful. I mean, nothing we were doing was unlawful. But the other issue, this court, as you well know, can affirm on any grounds, whether it was raised or not, as long as it's manifest in the record. That's Judge Lynch's case. And as long as it's manifest in the record, you can affirm on that ground. And it's clear that that issue is front and center in this appeal because it's front and center in Judge Burroughs' decision. Counsel, if I could approach a similar issue with a different set of questions. Part of the 93A claim, which was not the focus of the oral argument, was that the signage was misleading. And Judge Burroughs essentially said, no, the signage was not deceptive. That left other parts of the 93A claim the penumbra and the inherent unfairness. So you've just said the Gaming Commission staff expressly approved the signage. But that still leaves the other question about even if the signage is okay, warning people, is the practice of not having coin dispensing machines itself either an approved practice or possibly a violation of 93A? And now that I've framed it that way, what is your response? Part of my response is this. Although counsel stood up and talked about a class, there has been no class designated here. There is no class. There is a single individual with single individual claims. And with respect to whatever signage issue exists with respect to that individual, that individual full well knew because he had already sued about it. Except in one instance perhaps. But 11 of the 12 times, he clearly knew because he had already brought suit. In terms of the broader question, Your Honor, there is a question as to whether this is a permitted practice. We believe the state law reads such that a gaming licensee is required to comply with GLI-20 and GLI-20 permits vouchers. And quite frankly, the principal regulator has permitted vouchers. Counselor? I may have misunderstood. I thought the question wasn't vouchers but the casino's choice to have, because there are no TRUs that dispense choice to give alternatives, which in over 70% of the time result in more gambling. Or people pocketing it. Do you have any statistics in the record about how many people take these less than a dollar vouchers and actually go to the cashier's office and kiosk and cash them in? I don't, Your Honor. And the 70% number that you referenced, you're talking about a much broader sample perhaps than this single plaintiff. This single plaintiff has indicated that he chose. That's an argument that he's not a representative of the class, which isn't really before us. The question here is summary judgment and whether, you know, a reasonable jury could on certain assertions of these facts find an unfair practice, perhaps a deceptive practice under 93A. But, Your Honor, I differ a little. Yes, what I was talking about addresses some class issues, but there is no class here. So what we have to look at is Mr. Schuster's conduct and how did Mr. Schuster deal with the tickets that he got for less than a dollar. And he testified as to how he dealt with it. He either put them back into a machine and chose to gamble with them, or he threw them out in order to move on to other activities. That is his choice. And that's the entire record as to any causal connection between the conduct in which Wynn is alleged to have engaged and any damages he's claiming. Literally, those were his choices. Counsel, if we put your permitted practice arguments to the side just for a moment, I want to ask you what I asked your opposing counsel. The legal standard under Chapter 93A for determining unfairness. So we have a case, the commercial case that was cited in the briefs, where we say that in order to evaluate unfairness, we focus on the nature of the challenged conduct and on the purpose and effect of that conduct as the crucial factors in making the unfairness determination. Do you agree that that is the correct legal standard? Yes. Okay. So I think what your opposing counsel has argued is that there are enough facts in the record to create a material dispute about whether the purpose and effect of your client's policy not to dispense coins was something that causes harm to patrons. In other words, they keep gambling instead of leaving when they were trying to leave. Can you tell me why you think there is no material dispute on that issue? You asked at the beginning of your question for me to put aside permitted practice. Yes, I did. Right. So that permitted practice issue, I think, does govern. But there is no dispute as to what this plaintiff chose to do with his money. But choices can be made in an actual set of facts, right? And, for instance, one could argue that, of course, the purpose of your client doing this is to make it more difficult for people to fully cash out because who wants to go stand in the line? And by making it more difficult, you therefore make it more likely that they will continue gambling. And the statistics that your opposing counsel has cited suggest that that is, in fact, what happens. So can you just address why you think there's no material dispute just looking at that issue? It largely comes down to the notion of where did you get the ticket that went into the TRU to begin with. In order to even get the slot machine ticket, the plaintiff or any person who chooses to gamble has chose to put currency into a machine and to gamble with that currency. All they are getting at the conclusion of their gambling activity is should they go to the TRU. And two of the TRUs do provide points. All they're getting at the conclusion of their gambling activity are dollars and a voucher for a small number of sets. That's the exact same choice they made when they put the dollars into the machine to begin with. So you disagree that there could be, again, what specifically, I understand you've just made an argument, but what specifically in the record suggests it would be impossible for a jury to find that what you've just described is unfair? Because, again, obviously it creates a burden on somebody to go stand in line to get 50 cents. So can you point to me what specifically in the record suggests no jury could possibly conclude that? I don't think that there's record evidence of impossibility. Thank you. Thank you, counsel. Well, Attorney Garrick, please reintroduce yourself for the record. You have a three-minute rebuttal. Joshua Garrick on behalf of the plaintiff. I want to address three quick facts just to set the record, make sure the record's accurate, and then I want to go back into the GLI-20 argument. The first fact, Judge Lynch, to answer your question, the statistics of how many people actually went to the cage to redeem those tickets, our experts found that it was 2.2%. With respect to Mr. Schuster, if Wynn wants to make this solely about my client, with respect to Mr. Schuster, those statistics are even worse. It's 0%. Now, they argue that Mr. Schuster had two choices. He could have gone to the cage. He made the choice to either discard them or to gamble them. Well, Mr. Schuster could have had a third choice, which was he could have left the casino with those coins in his pocket. And if he had done that, the other two choices that they made him make, either go to the cage or gamble the casinos, were both an impossibility because the money would have been in his pocket already. In response to that, we were just told there were two TRUs that continued to dispense coins. So your client could have gone to those. So why is it more inconvenient to go to those two? Well, there's no evidence on the record to suggest that my client knew which of those two TRUs were the ones that had coins. My understanding were there was about 30 of these on the gaming floor. So to send him on a wild goose chase in a casino that if you've all been there, it's crowded, there's people everywhere, there's machines, very difficult to get around. I think that goes a little bit beyond the evidence, but that's certainly something that we could have presented at trial. When were those two TRUs that do dispense coins, which are placed, as I understand it, I've never been to the casino, placed by the cage, the cashier cage, if I'm using the right language, when were they placed there in relation to the lawsuit? Well, the machines were always there. No, I mean when were they reconfigured to dispense coins? In the three days after we filed the lawsuit and the gaming commission meeting, some point in that period of time they put coins back in the machines. And that brings up another factual dispute that we did not go to the gaming commission. We filed the lawsuit and the gaming commission said its own hearing. So we didn't file any sort of regulatory action. But going back to this GLI-20 standard, again, they never raised this issue below. In fact, we asked them at their deposition, what are the regulations that you've got? They said, we don't have any. The deposition quote is in the brief. They said, we don't have any authority, but nor do we know if there's any authority that prohibits it. And also, if this was the standard, don't you think that they would have brought it up at any point in time at all? At the gaming commission hearing? At the motion to dismiss hearing? Counsel, you can make a waiver argument. You do so at your own peril because they've accused you of waiver. We're more interested in a substantive answer, please. The reason why I bring that is not to discuss the waiver, although we did address that in the brief. The reason why I bring that up is because when they were asked, what is the reason? What is your legal authority? If that was the legal authority, all they had to do was say it. They fell into this baggage. They have said it, and it was covered by the district court. So what's wrong with the district court's analysis? Well, the district court's analysis doesn't take into account the applicability of the rule. The district court's analysis doesn't take into account that it says that the machines can be designed. These are design standards. They can be designed and manufactured to do this. There is nowhere in the GLI-20 standard that says a casino can, as a matter of policy, have a coinless TRU policy, coupled with their testimony under oath that they have no regulation whatsoever that permits this. It is disingenuous. In fact, it goes against the record for them to come into this court now and say, well, we have legal authority because they were asking for three years that this case was pending. Under oath and deposition, they didn't have anything. From day one, they didn't have it. The only reason why this came up was because we had referenced the GLI standards for a different reason in our opposition. And then in their reply to the summary judgment, that's when they raised it for the first time. There was no hearing below, so we never had a chance to give you all the information that we'd just given you, including the fact that this doesn't govern anybody except the suppliers and the design of the machines. For those reasons, this is a jury issue. The jury can be given the legal standard, and they can apply the facts, and they can make their own determination. We ask that you vacate summary judgment. Thank you. Thank you. That concludes arguments in this case.